Next case as soon as the lawyers are ready. Good morning. May it please the court. My name is William Bennett, and I'm here with my two colleagues, Lauren Wilgus and Kirsten Carlson. We represent Gunvor SA, and we're here today because the district court's factual basis for dismissing Gunvor's claim was clearly erroneous, requiring a reversal of decision. The district court misunderstood the relationship between the parties. Gunvor's claim is about misrepresentations by the Kayablians. Mr. Bennett, before you get into that, can you tell me, do we have a final judgment here? We do not. Well, what's the basis for appellate jurisdiction? Well, we have a dismissal, Your Honor. Right. Without prejudice. Yes, Your Honor. Generally, those aren't appealable. Well, it is appealable because we have a dismissal of a claim. Right. Without prejudice. So that gives you a right to amend your complaint. Right? We could amend the complaint, correct? Right. Unless you say that that's it. Do you say it's impossible to amend your complaint? It would not be impossible to amend the complaint, but what we have is a district court that has determined that a party is indispensable, and therefore we lack subject matter jurisdiction. Okay. Is it impossible for you to make a claim? All you have to say is yes to make the claim that you are making. Is it impossible for you to succeed in this lawsuit by amending your complaint? No, I think we could succeed. Then it's not appealable. You look like you've been practicing law as long as I have. You know, you have to have a final judgment. Understood, Your Honor. But we do have a dismissal, which is final in nature. No, it's not final if you can amend your complaint to state your cause of action. Mr. Bennett, could you amend your complaint to address the concerns expressed by the district court in such a way as to survive the motion to dismiss? Or is what's in that complaint the best you've gotten? There are no more facts. We could articulate the reasoning why the district court misconstrued the original complaint. Those don't sound like facts to go into court. For example, the court made two findings. One was that the core agreement was for Gunn Board to purchase oil. That was incorrect. The second mistake that the court made was that the Clause 16 was an integration clause. Clause 16 is not an integration clause. A simple reading of that is that actually it's opposite to an integration clause. But those are legal conclusions. Those are legal conclusions, Your Honor. What we're talking about is facts you could add to your complaint that might fill in the holes that the district court believed existed. Yes, Your Honor. You can do that or you can't do that. Can you add nymphs and have a viable claim? No, according to the district court, which we believe was wrong. I'm asking you, can you join nymphs as a party to this suit and still have a viable claim? Not in the federal district court. Okay. But when the grounds for the dismissal clearly indicate that no amendment in the complaint could cure the defects, then we don't say that it's not appealable. And that's why we keep asking you if there is anything that you could cure the defects in your case by amendment. What I believe may be different than what the district court would rule. So for us, for Gunvor, we would like a reasoned opinion by this court to tell the district court that its ruling with respect to nymphs being a necessary indispensable party is wrong. So that whatever amendments we make for the claim against those parties that stole $28 million survives in the district court. And we don't get, for example, there is a, there is dicta within the two pages of substance in the, in the oral opinion. There's dicta that this court, that the district court believes that the arbitration clause is applicable here. If you look at the entire. Sir, I'm trying to help you. Okay. Let me try one more time. You do not have an appealable order unless you say to us, there is nothing we can do about our complaint to remedy the problem that the district court found in it. We have no remedy. Okay. We cannot, we can't. I apologize, Your Honor. We cannot amend our complaint. Because it was without prejudice. It would be like you were trying to, um, if the district court had said, um, anyway, I think it's, it's hopeless, but all right. I think that satisfies us. Does it? It's almost a checkmate, though, it seems to me. With respect to nymphs, there is no way that we can amend our complaint to get over that hurdle. The district court believes that based upon the contract, the fuel oil contract, they're an indispensable party. She was, the court was wrong in that regard. Well, we understand you think the court is wrong, but that doesn't make any difference with respect to whether this is a final order or not. It's a final order because there's no language that we could put into our complaint that would get over the hurdle that nymphs is an indispensable, necessary party. Okay. We cannot bring them in. And continuing on, the district court made two findings which were in error, which was the basis of their holding. First, that the fuel oil contract was the core agreement. And two, that the clause 16 within the fuel oil contract was quote unquote the entire agreement, was an integration clause. First, with respect to clause 16, it is not an integration clause. It is in opposite to an integration clause. In that entire agreement clause, paragraph 16, it has three limitations. The limitations are is that that fuel oil contract is only between NEMS and Gunn-Boer, not the other parties to the JV, Amira, Jepps, and in fact, those who purchased the fuel oil from Gunn-Boer. The second limitation is in the first paragraph, it talks about the subject matter of the contract. The subject matter of the contract was the individual, either 50,000 to 70,000 metric tons of fuel oil. Not what the parties believed to be the JV, which was a long-term agreement to carry and ship hundreds of thousands of metric tons of fuel oil. Do you have any evidence that the, how do you say it, your opponents? The Kyableans? Yes. Use Nemesis as an alter ego. We haven't gotten to the discovery. Is there any allegation about that? Not that NEMS is the alter ego, but that Amira was an alter ego. But NEMS is all over the documents. Yeah, NEMS was a subsidy of Amira, Jepps was a subsidy of Amira. Right, so it seems to me pretty obvious that you're just carving NEMS out of this case so that you can get into federal court. I mean, and I think that really reflects the district court's sense of the case. I mean, you know, you have these alter ego aspects. You have Gunvor entering. Gunvor was the one who's receiving the $100 million. Excuse me, NEMS received the $100 million from Gunvor, did it not? No, they did initially, but the purpose was. Yes, yes, exactly. They did initially, so how can they not? And the claim is for the $125 million, of which the $100 million is a part. So how can NEMS not be indispensable in this case? No, the money that is missing was not to purchase fuel oil. Right, but the money went to NEMS initially. It went to NEMS and NEMS gave it to Jepps. That was part of the agreement. If you go to the first email by the party, the first email that we receive from Amira, not NEMS, not Jepps, from Amira, is from their fuel oil trader, who says Amira has won a contract to move fuel oil out of Iraq. They have a meeting. There's a presentation made, and at that presentation, there are three things that Amira asks Gunvor. Can you fund our project? Can you get us clients to purchase our fuel oil, and can you move our fuel oil? The fuel oil contract is very distinct. It's for one particular shipment. That's not what the joint venture was. This was a long-term relationship. The email that follows the immediate, follows that meeting one day later, again, Amira, not NEMS, not Jepps, is writing to Gunvor, and it's from their fuel oil trader. A quick recap, and this is Joint Appendix 93. They talk about an advance of a credit facility to facilitate the purchase of fuel oil from IOTC, which is in line with the JV goal of lifting more fuel oil from IOTC. It's a 50-50 joint venture to grow the business together going forward over the long term in a joint venture basis. Six months later, again, there's an email, Joint Appendix 147, again, from Amira, and they're talking about going to Jepps, getting Jepps' documents, pushing Amira to give us all of the documents for the entire JV. Mr. Bennett, let me ask you a question, please. Yes, Your Honor. What law do you contend governs the questions involving the joint venture, the creation of it, the rights and duties and responsibilities of the members of it? What law would apply to the joint venture? Right. Well, we have Amira and the Kayablians. Just tell me which law. U.S. law. U.S. law. U.S. law governs the creation of this joint venture? Yes. And on what basis do you believe U.S. law? The Kayablians were in Washington, D.C. and Virginia when they were negotiating and sending emails to us about the joint venture. Okay. Would you also explain to me how NEMSIS cannot be a member of the joint venture? They are part of the joint venture, but our claim is not for a breach of the fuel oil contract with NEMS. There were five separate individuals. But it's about the breach of duties of the members or partners, not partners, but members of the joint venture. It could be an intentional tort, misrepresentation of fraud that predated the fuel oil contracts. When they came to us and said that they had the ability to move certain oil, they didn't. And then they stole our credit facility. We don't dispute that we purchased $100 million of fuel oil and that we paid them $100 million. What's missing is the credit facility that they asked for. So they would have bona fides to go to IOTC through JEPS and obtain the right to get their fuel oil. I thought these documents, some of which you rely on to prove a fraudulent inducement, were presented in Switzerland. Yes, Your Honor, they were. Physically presented in Switzerland. Yes, Your Honor, there was a presentation made in Geneva, Switzerland. So you don't believe Swiss law controls those claims? It may well, Your Honor, when we do a balancing factor, but we never got there. My argument is it would be U.S. law. We have the Kayablians who were based here in the U.S. who were negotiating the deal and who were the ones that wanted to deal with Gunther. They approached us. We didn't approach them. Okay. Outstanding. And there's one more thing. The joint venture is not between Gunther and NEMS. It required multiple movements. You had JEPS purchasing from IOTC. You had NEMS and JEPS, two subsidiaries of EMIRA, who were actually entered into a contract because there needed to be a series of contracts to follow the flow of this joint venture. But wasn't NEMS the one that directed JEPS to buy the oil from IOTC? No, it was EMIRA. Remember, the initial contact to us is, quote, I am EMIRA's fuel oil trader, and we have a contract with IOTC. But NEMS got the funds from Gunther, right? Gunther's money flowed through. And didn't that put it in motion that they then directed JEPS? Yes, the credit facility. The credit facility went from NEMS to JEPS, to IOTC. Okay. And then the end of it was. . . I think your time has expired. You can finish your sentence, and then you get some rebuttal. Yes. The end of it was Gunvor had the ability to ship and sell to its customers. Gunvor wasn't, quote, unquote, purchasing the fuel oil for their own. They were selling it to their worldwide customers for the benefit of the JV, and they had to do an audit from turning on the spigot all the way to delivery to the buyer, and that is now what the fuel oil contract is. Thank you. May it please the Court. Good morning. William O'Brien on behalf of the appellees. The case is a fuel oil case. It's what? It's a fuel oil case, and all seven counts of the complaint are seeking two things. One would be the prepayments that they returned, and two would be delay damages. Would be the what? Delay damages, Your Honor. All seven counts of the complaint go to those two elements. They're demanding in all of the counts of the complaint either the $23 million return of the prepayments or delay damages. If you add those two together, it's $33 million. So you'll see those two figures over and over again in counts one through seven. Those fuel oils, those damages for the return of the prepayments, those prepayments were made under the four fuel contracts. The four fuel contracts are on the record. The amounts that are listed in the complaint match exactly the four fuel contracts. The delay damages are under the four fuel contracts. Those four fuel contracts were executed between NEMPS and Gunvor. And as the court pointed out, the payments were made $100 million to NEMPS by Gunvor. Gunvor signed that contract. They had agreed to an arbitration clause, English law, Your Honor, English law, London Court of International Arbitration. We've always viewed this case as an attempt to carve out NEMPS just to be in federal court. The complaint is sort of awkwardly written to just try to ignore. If you could bring the microphone a little closer, you have, I think, a great voice for the courtroom, but this courtroom swallows everything, and we're old. Go ahead. Thank you, Your Honor. Is that better? Yes. Thank you. So NEMPS signed the contract. The prepayments listed in the complaint were under those contracts. Gunvor attached to the complaint confirmation of the prepayments to NEMPS. The invoices are attached, the invoices that were sent to NEMPS. The first paragraph of the complaint says that the case is in connection with the fuel oil contracts. Gunvor defines NEMPS to the court's question about alter ego. In count seven, Gunvor defines NEMPS as the Amira group, including defendants Amira and non-party NEMPS. So the very count, three of the counts, in fact, name NEMPS in the complaint. So going forward on that, how can the other parties force the case to arbitration? So Gunvor and NEMPS are the only people that are signing or the only entities that are signing the contract that has the arbitration clause. Isn't that right? Well, Your Honor, as far as the other parties, if you're referring, for instance, to the Kayabulians, they are officers and directors of NEMPS, and they are acting on behalf of NEMPS. But I thought the gist of your argument in front of the district court is that all these people are distinct entities. That's why there was a defect in not putting NEMPS in the case. True, but if the court's question is how are those parties then involved in the arbitration, if at all, non-signatories are entitled to be in the arbitration in the appropriate cases, and certainly the court's aware of the instances when that can happen, specifically for the Kayabulians, they are entitled to arbitration because they are the officers and directors of NEMPS. And as such, they're entitled to the protections of the arbitration clause to which NEMPS agreed to. Remember, this is, by the way, Gunvor's contract. This is a Gunvor-drafted contract. When we look at questions involving the formation of the entity that was going to handle these things, according to the plaintiff's complaints, what law determines the rights and responsibilities of the members and who the members are? We believe that it would be English law by contract owner or for the contract specify English law as the governing law. And do we know what that tells us about the issue in front of this case, before this case? In what respect, Your Honor, what specific issue? About the necessary party. Do you think that that is also governed by English law? Well, it's an interesting question, and I'm not sure that it's essential for the court to determine the answer to that, because the clause is a very standard one. The disputes resolution clause is a very standard one. It covers the entire dispute. Right. The formation of the parties, all of the claims, including the fraud claims. Right. So I'm not sure that we have a rich equation. But if English law was different, then let's just assume that the district court has correctly interpreted Rule 19. But if there is no – if the English rule is different than Rule 19? I'm not sure that the court has to reach the English conclusions on whether – That's what I want you to tell me why. Okay, because, again, Your Honor, it's a very standard international arbitration clause that completely governs the dispute. Fraud, whether it's breach of contract, whatever the claim is, it is by contract to be covered in arbitration with a citus of London. I see. So, yeah. But that doesn't really answer my colleague's question about what law controls. That just tells us what the venue is going to be, where it's going to be heard. But – and we know that the American Arbitration Act doesn't control, right? Your Honor, the clause does specify the governing law as English law. Right. Yes. And so whether – but that's not necessary for the court to resolve the question of whether English law would determine who's a necessary party and who's not a necessary party. The analysis goes under the arbitration clause itself, which says that any claim arising out of or related to that contract is to be resolved by the arbitrators in the London Court of International Arbitration under English law. So whether you have – you know, who should be a party to that case if you should have a non-signatory as part of it? Are the protections applicable to the Kayyablians? That's all to be settled by the arbitral tribunal in London under English law, London Court of International Arbitration. So what you're saying is that that is the next step. Yes. Is that a fair characterization? That is, Your Honor. You're saying the first step that is in front of us is the issue of the necessary party, which the court had to decide. And then and only if the case proceeds, then the arbitration clause and the application of it to the dispute here then becomes an issue, arguably, of different law to be applied. Yes, Your Honor.  Okay. And again, whether a necessary – whether – You're not suggesting that in arbitration, the arbitration court in London or England, wherever, could conclude that – could reverse this ruling about necessary party. They're stuck with that, right? No, I'm not suggesting that, Your Honor. So I'm not exactly sure how that works. Sure. Judge Keenan, I think – I understand. I understand exactly what she said, as usual, very lucid. But I'm not sure if English law does control here what it is – what effect this ruling by the federal district court has. I think the effect is that it enforces how the – Oh, so I think what you're saying is that in this action, it controls. And then, because you're going to go to arbitration – Yes. Yeah. Yes. And in terms of whether – we haven't really talked in great depth about the necessary party. But, I mean, as the court noted in the opening argument, the NEMS party is named more than 20 times in the complaint. They are the contractual – the party to the contractual vehicle that governs every single count of the complaint. In the reply brief for Gunvor, it says that – Gunvor itself says it's in its reply brief. The complaint is, quote, replete with allegations concerning the Diablean's manipulation of NEMS for the benefit of themselves and the emirs. That's in Gunvor's own reply brief. Gunvor has said it is clear that NEMS is a necessary party in that statement in its reply brief alone. Gunvor states in the complaint that NEMS is a, quote, partner. NEMS's partner, Gunvor, has suffered injustice and inequity and possibly outright fraud. That's JA 37, paragraph 137 of the complaint. And they're seeking $33 million in damages, again, the prepayments under the four fuel contracts and the delay damages under the four fuel contracts. Those are against the emira group of companies, which Gunvor defines to include NEMS, JA 3738. And they're seeking delay costs again at JA 29. So there's no question. This is not a close call. NEMS is a necessary party. Judge Brinkman had all of these documents before her when she was making this ruling. It's well-reasoned. It's well thought out. She also indicated, quote, for the record that if she were to file a jurisdiction in this case, she would compel arbitration. For the same reason, she had the contract in front of her. She read the disputes resolution clause. She noted that it was not a close call, that it would go to arbitration as well. So we do view it as a case in which the attempt was made to just, Gunvor just wanted to be in federal court, presumably the discovery and all the things that come with federal court, to get around the arbitration clause that called for mandatory arbitration in London, London Citus, to go after the Kayablians in their individual capacities. In their backyard, they note that they reside in Virginia, so they sued him in federal court in Virginia in their backyard, as opposed to going to their own contract, Gunvor's own contract, which called for arbitration in London. So we think that taken together, it all adds up to an attempt to carve this case out of federal court, or rather out of arbitration into federal court. Mr. O'Brien, can I go back to where I was in the beginning with your colleague? You don't make a claim that this order is not appealable, do you? We haven't made that claim. In the underlying case, it's for this court to decide if it's appealable or not. What's perplexed us, Your Honor, is that they did, of course, have the opportunity to go to state court if they felt that they truly had a case along those lines. They did have the opportunity to move to amend. They never did so. We did note that. So it's for this court to decide whether it's appealable or not. We believe that — I don't think your motion is in the record. All your exhibits are. It's in the record, but not in the JA. Is that right? That's right, Your Honor. So did you ask for a motion? Did you make a motion to dismiss without prejudice? I don't recall, Your Honor. I'll tell my head court's indulgence. We could sort that out if you'd like. No, we can look at the actual record. I just thought you might remember. Bottom line, Your Honor, we think that the decision reflects that Judge Brinkman looked at all the documents that are in the record in terms of the invoices, the contracts, the repeated naming throughout the complaint, the integral role that NEMS has played that is described in the story throughout the complaint, that it's not a close call, that they are a necessary party, and that it's not a close call, that it should have gone to arbitration. Thank you very much. Thank you, Your Honor. Mr. Bennett, you have a little rebuttal. Yes, Your Honor. Thank you. First off, Clause 16 limits who has rights under the contract. The last sentence says, This contract is not intended to give any third party the right to enforce any of its terms. The Kayyableans and Amir are those third parties. They cannot demand arbitration. We cannot amend the complaint to bring in NEMS, which the district court has deemed to be an indispensable party because that would destroy diversity jurisdiction. JVs have many contracts and many roles. This JV was JEPs purchasing from IOTC the fuel oil, NEMS and JEPs who had their own separate and distinct contract with also a reconciliation clause, 50-50 expenses, bringing that fuel oil to the port, gun bore, purchasing that fuel oil, contracting ships and contracting, selling the fuel oil. Many roles, many parts. The fuel oil contract was just one of them. In the complaint, Paragraph 90, it lists all the credit facility, the amount of the credit facility, the $28 million that was stolen. It wasn't $23 million. It was $28 million. That was the credit facility. It wasn't a prepayment. With respect to the delay claims, in maritime parlance, there is a delay claim, but what counsel is talking about is demerge. It's the vessel sitting there waiting to be loaded. It's called demerge. That clause is not in the fuel oil contract. A demerge clause is in the charter party between gun bore and the ship owner. Gun bore had to pay a ship owner more days while it sat there because the Cayableans made material misrepresentations in their initial meeting before the fuel oil contract was even entered into and said we have access to 100,000 metric tons of fuel oil. They didn't. So, yes, there may be some claim for demerge, not for delay. That's a totally distinct cause of action. It's demerge as a result of the misrepresentations. The MasterCard case is a key case here. The MasterCard says a third party may be significantly impacted, but that does not make them necessary. If this case were to go back down to the district court and the Cayableans were found to have intentionally defrauded and made material misrepresentations, NEMS, under their contract with gun bore, would not have any of their rights disturbed. And the argument that somehow the Cayableans as officers and directors could seek indemnity from NEMS, that may happen. But anything that happens down to the district court would not impact NEMS's defense of that case. So NEMS is not prejudiced here. They're not necessary and they're not indispensable because any judgment that the district court renders can protect NEMS. For example, the district court can determine that in that initial meeting the Cayableans made material misrepresentations and then stole the credit facility while it was in Jeps' bank account. And in their individual capacity, not as officers of NEMS, they committed a fraud and misrepresentations. NEMS is protected. There is no legal basis here that Rule 19 applies to. Okay, what about your own pleadings, though? What about Joint Appendix 16, where under the joint venture NEMS would make all arrangements and incur all expenses on the shore side, lifting the fuel oil from the refinery, transporting it by truck to the port, and Gunvor would make all shipping arrangements and incur all the shipping-related expenses. NEMS and Gunvor would then share their expenses and their income from their respective sales of the fuel oil on a 50-50 basis. Now, is that your pleading that the court was ruling on? Yes, that is, yes. Okay, thanks. But what it fails to appreciate is if you go to the Jeps' NEMS contract, they also have the same language. No, I'm just asking you whether I made a mistake, and that's your pleading. No, there is no doubt that on each stage of the joint venture, the parties needed to share expenses and cost 50-50. But the fuel oil contract was a separate and distinct shipment, four separate, distinct shipments. That wasn't the plan for the parties. The plan for the parties was to have a long-term, lasting relationship to move hundreds of thousands of metric tons of fuel oil. The fuel oil contract talks about the subject matter. What is the subject matter of the fuel oil contract? It is the distinct shipment of 50,000 to 70,000 metric tons. It's not the joint venture. That is our pleading, but what the district court fails to appreciate is that there is the agreement between Jeps and IOTC. There's an agreement between NEMS and Jeps. They only concentrated on one segment of the entire joint venture. And let's not forget that it's not, we didn't propose the joint venture. That language was from Amir's fuel oil trader, and it wasn't NEMS that approached us or Jeps that approached us and said we have access to the Iraqi oil. It was Amir's fuel oil trader. And they came to us and said we want three things from you. We want a credit facility. We want access to your worldwide contacts who will purchase fuel oil, and we want you to ship the fuel oil for us. And at the end of the day, we're going to do an audit from the time the spigot at IOTC is turned on until the time that you deliver that last drop of oil to the buyer. That's not what the fuel oil contract was. I know I have 34 seconds left if I have any more questions. Your Honor, I apologize for not being sharp on the uptake about the amendment, but it's clear that we cannot satisfy the district court in bringing in NEMS because we would destroy diversity. And there are many cases that are filed in federal court that can also be filed in state court. And is this one of them? Sure. But we – as my learned colleague has said, we did come to the Kayabulians' backyard to get our $28 million. Thank you. Do you want to take a break? Do you want to take a break now? We'll come down and greet the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, Barbara Milano Keenan, William B. Traxler Jr.